Very well, Mr. Piscanes. You're ready. Thank you, Judge Bryson. May it please the court. Actually, for the record, I don't think I called this case. I'm sorry. King Pharmaceuticals against Eon Labs, 2009, 1437. Thank you. Again, may it please the court. For Appellant King, I'm going to address the merits of the appeal, and then Mr. Monroe, who's counsel for Elan, is going to address the jurisdictional issue that's presented in his client's brief. In 2001, scientists working for Elan conducted pharmacokinetic studies on scalaxin, and discovered that when scalaxin was taken with food, most patients benefited from increased bioavailability of the drug. That was a new discovery, and it was a useful one. No one in this case disputes that the Elan scientists were the first to discover this food effect of scalaxin. Elan then sought to patent this discovery in the form of an invention. Importantly, what Elan did not do in its claims is to simply patent, quote, taking the tax alone with food. But that's how the district court erroneously viewed several of these claims. The errors that we believe the district court committed in this case fall into three categories. First, even though Eon did not move for summary judgment on this ground, the court erroneously declared several of the patent claims invalid under Section 101 of the Patent Act. Can I turn to those claims? Well, firstly, is it your view, whichever way we come out on this question, that there's a difference between informing steps and the printed label claims? I mean, it seems to me one's written and one's oral, but they both deal with the same thing. Do you see a difference between treating those two different types of claims? I think, Judge Post, the only difference that I could perceive in those is that the informing could take place in ways that include a label, but not necessarily are limited to a label. So what would be the patentable significance of that distinction? Well, the patentable significance of the distinction about the informing step? Yeah. Between Judge Post's two claims, the informing versus the label informing. Well, I don't think there's a distinction. I don't want to draw a distinction between two of them, because I think they're both patentable and both patentable subject. So whether they're both patentable or both non-patentable, the question is, is there any reservation there? I don't think so. I don't think so, as I stand here. I don't think there is. I wouldn't draw a difference and say, well, one might fall and the other might not. I think they're going to stand together. What about Claim 6, then, of the patent? The one that we have not chosen to appeal? You have not appealed it. And that was rejected by the court on a 101 basis. That was an informed step, right? It was. Claim 6 of the 102 patent was a method that comprises informing full stop. And to the extent that if there was any claim in either of these patents that might not be patentable subject matter, that would be the one we've chosen not to appeal it and clear the record with that. With regard to, if I can just lay out the markers for where I'd like to go with the limited time I've got, one is the 101 issue. We think the two errors that were made by the district court were, one, the court applied the 101 standard to only one element of the claim, contrary to the teachings of all the Supreme Court cases. But even if you get by that, you're still up within an anticipation or an obviousness rejection based on those informed, and we're talking about the informing claims now, right? We're talking about all the rest of the claims that include informing, but they also include, for example, Claim 1 of the 128 patent, which was held to be inherently anticipated. That one does not include, if I remember correctly, an informing step. It's a method of increasing the oral bioavailability. And the court rejected that under 101? No, the court rejected that one under 102. I'm just saying that the anticipation arguments go beyond just the one. Sure, I appreciate that, but you said you wanted to start with them. I'm happy to accommodate you. And then with regard to the other aspect of 101 that we think the court made an error on besides applying it only to one limitation in the claim instead of the claim as a whole, the error that we think the court made here, and to be fair, it didn't have the judgment rule in it. No, I appreciate that. I understand the argument you're making there. I'm just having a hard time figuring out, now dealing with the informing step claims that were the subject of the 101 rejection, what the daylight is with Inrei Nagai. I don't know how to pronounce it. Okay, that helps me understand where you're coming from, Judge Prostit. Inrei Nagai is a product claim case. And it's very clear, Nagai very clearly said in concluding the method. And the claims covering that invention were properly allowed. He is not, however, entitled to patent a known product by simply attaching a set of instructions to that product. Okay, well, there's no, I mean, so you're right. This is a known method and that was a known product. I don't see that that distinction would in and of itself take this case out of the realm of relevance. And that's where I would disagree, because it wasn't a known method. Because here's the prior art. Baby Tube, Albanese, Abrams, can all be read to say, if you have nausea or for whatever reason, you might take a tax loan with food. But it's all three of those references, to be fair, are limited to, here's how you deal with nausea. Now, here's what neither the prior art nor anything, neither those three pieces of prior art nor anything else before 2001 allowed for. And that is the specific instruction of, take this with food because you will get a better bioavailability effect. Or you are likely to get a better bioavailability effect. That couldn't have been in the prior art because nobody knew about it. Your argument would not be different, I take it, if the prior art had had written instructions saying, take this with food, given that the reason for those instructions was to combat nausea. But you would be making exactly the same argument today. I would be making exactly the same argument. And what's important about it is that the instruction is specific. And I use this as an example for myself. If a doctor gives me a pill and says, you should take this with food because you will not have nausea if you take it with food. Antibiotics is a good example of that. But at the same time, I know from 40 plus years of experience taking pills that I don't have a problem with nausea with pharmaceuticals. So I ignore that. On the other hand, if you tell me I will get a better bang for my buck, so to speak, I will get better relief from back pain by taking this pill with food, I will take it. And that's not just me making that up with a lawyer argument. That is the testimony of Dr. Elia or the declaration of Dr. Elia that was will more likely yield them taking the pill. That couldn't have been the prior art. Okay. No, no, no. Okay. Accepting that. And I guess you have to assume that maybe we're at one place with respect to the anticipatory. But let's assume we conclude that the other claims go down on inherent anticipation. Okay? And the other claims here, just so I'm clear. There's so many claims. I'm sorry you asked. The non-informing claims. I'll assume with you that that's the case. Okay. So you are asking us, so you can tell me if I'm wrong. You are asking us to come up with a rule of law that says newly discovered results of known processes directed to the same purpose are not patentable with the exception of instructions, oral or written, referring to such newly discovered. I think that if that were the holding of this court, then that would clearly yield the result that we want here. Yes. But tell me how that distinction is, what the basis is, what the legal basis is for drawing that distinction of saying one class are not patentable, but the instructions for that non-patentable class are patentable. Well, there are two aspects to it. First, of course, is what I just explained to you. That it does actually do something new. And that is it gives a particular set of information to empower patients to make the right decision in taking the drug themselves. But the other aspect- No, I mean, the question is taking it with food or not with food. It's not, right? Well, that's the act that they do. But the question is, or that they are asked to do. And the bioavailability goes with the step of taking it with food or not taking it with food. Well, and again, I want to make sure that the court is clear on this. The court concluded on the other side that that is the inherent and inevitable effect. And again, if you look at the testimony or the declarations of Drs. Elia and Barber, A3220 for Dr. Elia, A3266 for Dr. Barber, you will see that they testify that it doesn't happen with every patient. In fact, there's evidence in this record that it doesn't happen each and every time. It's just more likely than not. But Judge Prost, I think the way to think about this is that the Patent Act allows for patents on inventions. And one of the definitions of invention is a discovery. Now, we know from case law, the Supreme Court case law, that a pure discovery cannot be patented. It's got to be patented in the form of something a little more concrete, a little more of an invention. And so that's what these scientists did. They discovered something, but they didn't just say, oh, I've discovered an effect, like in cruciferous sprouts. They said, I've discovered an effect, and I'm going to make that effect a narrowing limitation that takes me above and beyond the prior arc. And so I'm going to tell people, I'm going to make it specifically required by this claim, that you tell people what happened. So you mentioned the sprouts case. And in that case, if there had been a claim saying, here's the benefit you get out of taking these sprouts, then 5,000 years of history of prior taking of sprouts would have been overcome? I think if the claim limitation was informing the, it's not a pharmaceutical case, but informing the eater, informing the eater of the sprouts that you will get a cancer-risk-reducing effect from eating these things, then if that is truly a new step and it's not inherent, then that information, it wasn't known. It wasn't known before. That particular effect wasn't known. But if you don't reveal the effect, we all agree that the case stands for the proposition that so what, that there was a new effect. And so you're saying the difference between the so what result and a result that's patentable is that you create a narrowed the claim in a significant way. That it adds something new. It wasn't something that was in the prior art and in the possession of the public. We're not claiming anything that wasn't, that was out there before. We're only saying that if you do these two things and you inform the patient, a very narrow specific thing, then you get that is new, it is useful, it is non-obvious, and it is not anticipated. What would make it then hypothetically? Let's assume for the moment that I'm sure that all mothers do this. I know my wife did it with our children in order to take bad tasting medicine. She gave them a spoonful of sugar. If that spoonful of sugar created a process by which the bioavailability of the medicine they were taking improved, does that make it new? If someone then subsequently said give this child medicine with a spoonful of sugar. Well, what you've described is pretty much on all fours with cruciferous sprouts, which is just do the same thing that was always being done. You can't get a patent for that. But if you added a label saying take this with sugar, because it will give you double bioavailability, yes, that is a patentable difference. But how do we get around the Supreme Court case that says that if you add a known step, it doesn't make it patentable? The algorithm issue in FOC. Well, first of all, I think then you come back to the you're adding one limitation and not considering the patentability of the claim as a whole if you're looking at it from a one-on-one perspective. But you're adding that one limitation to make it patentable over the prior art. That's true. And I don't think what we're doing here is akin to an algorithm at all. It's a well-known step, though. It's taking on food. Well, the taking is a well-known step. The informing is clearly not. That's the point of distinction here. The taking is well-known. When I come to this case, I think, gee, people have been taking medicine with food, lots of different kinds of medicine with food a lot. But they've never been told, particularly with regard to metaxolone, that if you take it with food, you're going to get or likely going to get a better effect. Now, Judge Bryson, I'm already well past not only my rebuttal time. Well, it's chargeable to us, not chargeable to you. And we'll resume in due time. I'm here for anything else you need. Otherwise, I'll save the rest of my time for rebuttal. I think Judge Gray has some answers. One more question with regard to the inform. If the inform step is the only element which makes it patentable, what inherency would that have then if it was known that even if the food was taken just to prevent nausea, but in the process it also increased bioavailability? Well, then you have the problem that the evidence of record here on the summary judgment appeal is that it doesn't happen each and every time. And that's where the enhanced bioavailability is actually a limitation of several of these claims. The district judge seemed to think in some of those claims that that was just preamble language. But in point of fact, the patent examiner required that language before it would allow the claims for patentability. But the district court— He made an alternative ruling. Yeah, he did decide this case, assuming that the preamble was a limitation. Right. But at the same time, once he did that, then he failed to appreciate that the limitation was not in the prior art, because that clearly was not inherent in Fadi II, Albanese, or Abrams. Very well. We will restore your rebuttal time, and we'll hear from Mr. Munro. Hi. Mr. Munro on behalf of Elan Pharmaceuticals. And my comments today will focus on the jurisdictional issue that has plagued Elan since King first filed this case against Eon back in 2004. This jurisdictional issue is important not only to this case, but to any case in which a patent that was previously owned by someone else is at issue. Well, that may be the legal principle that's important. Is there any practical principle at issue here? Yes, Your Honor. As a practical matter, the premise that Eon has put forth would effectively result in the possibility that any time a defendant in a patent litigation wants to, it can bring in a prior patent owner without establishing what is necessary for a declaratory judgment jurisdiction. That defendant can claim, as Eon did here, well, the prior patent owner was involved in filing and prosecuting the patent application, and therefore is a proper party to this case. And they can argue, as Eon has here, that that prior patent owner must have some sort of rights without actually identifying what those rights are, and therefore that patent owner should be involved in the case. And as a practical matter, that will lead to what the case or controversy requirement is intended to prevent. The case or litigated in a declaratory judgment matter are those where there's a substantial controversy between parties. I understand that. I understand that. I'm just wondering if there's a tangible consequence to your client to be in this case or not to be in this case. Yes, Your Honor. And actually, Eon is very direct that the only reason it really wants in the case is it wants to argue later, and it actually is arguing right now, that Elon is responsible for Eon's attorney's fees in defending itself, Eon defending itself against King's suit. Eon has brought Elon into this case as a counterclaim defendant in order to then argue the court issued a judgment in favor of Eon on that counterclaim against Elon. I mean, if you stay in this case, you're arguably on the hook for attorney's fees that might be forthcoming. What, is there an equitable conduct claim working here? No longer, Your Honor. Eon agreed to dismiss all counterclaims, including inequitable conduct, in order to get judgment. The only claim remaining is an attorney's fees claim. Well, but the attorney's fees claim is under 285. Correct. What I didn't understand, and this is 7464 of the appendix, has, I believe that's your plea, saying Elon will remain subject to this court's jurisdiction should the need ever arise for purpose of resolving the claims for attorney fees based on a finding the case is exceptional. I don't understand what that is intended to suggest. Are you saying that you will come back into the case in the midst of the attorney fee? It does sound to me, and I'm looking at this from not having the detail that you and your opposing counsel have been dealing with this issue, but it looks to me like the core dispute between you is not so much whether you're going to sue anybody else, but it has to do with the attorney fees. That is correct, Your Honor. OK. Now, are you in or are you out? And if we say, OK, you're out of this case, does that make a difference with respect to the attorney's fees, given the representation that's made on 7464? I'm just not clear how all that plays out. Well, it's further complicated, Your Honor, in that— I was afraid you would say exactly that. Procedurally, there was a prior litigation in which Elon brought suit against Elon based on one of the two patents, and that case ultimately got dismissed because Elon gave up its product. This is the 800— The 400. The 400. And Elon withdrew its ANDA for that product, and therefore that case went away. The judge, as far as just expediting the matter procedurally, dismissed all claims and counterclaims, but somehow severed and transferred and consolidated the attorney's fees claim in that case into the 800 milligram case. And then, in purposes of trying to negotiate our withdrawal from this case, because Elon would not accept our representations that we had no rights and would never enforce any rights, even if we had them, we agreed that we would go ahead and be subject to the attorney's fees claim in the 800 milligram case to the same extent that we were subject to the jurisdiction. Now, what does that mean, subject to the attorney's fees claim? I mean, are you basically walking away from the case but willing to open your wallet if there's a judgment against the other party? Or what's going on here? Absolutely not, Your Honor. We did not— That's what I wondered. I doubted. I wasn't sure. Elon did not agree that an attorney's fees claim would be appropriate against Elon. Elon maintained during the 400 milligram case and the 800 milligram case that Elon did not have a viable attorney's fees claim. I understand that. What I'm saying is— From a case of controversy standpoint. But they presumably think that they do have a case against you under 285. Now, understandably, your position is they don't. But is it your position that you're prepared to leave the field of battle on that issue? And if they end up with a judgment that you'll end up paying part of the judgment? That can't be right, right? No, Your Honor. But so what does this subject to mean? Our position is subject to litigation of that issue in which Elon will vigorously oppose any suggestion— But you'll be back in, in the litigation of that issue. Correct. And that's where we have our problem with how can there be jurisdiction over a request for relief for attorney's fees? I mean, there's a jurisdiction over the— there has to be some other claim associated with that request is Elon's position that they've argued to the court. The court did want to resolve that. And so the court said, I'm just keeping you in in case there is an issue upon which you can be held liable for attorney's fees. Elon's position is there cannot, as a matter of law, be an invalidity counterclaim against Elon under these circumstances. And therefore, that— any holding as to invalidity cannot lie against Elon. And Elon cannot be obligated and liable for attorney's fees relating to such an invalidity counterclaim that could never exist in the first place. Well, I presume that under your sale, you'd have some representations and warranties to King indicating that the patent is valid and so on and so forth. If it's determined otherwise, then you'd have to make good on those reps and warranties to King. If King is subject to attorney's fees, they might come after you for those attorney's fees. Oh, your honor, it's correct that there are provisions that relate to the relationship between Elon and King, and that if there ever comes a time where judgment's rendered against King and King wants to come after Elon for attorney's fees, that will be a separate litigated matter with respect to our responsibility. But you're not agreeing to pay those now. Absolutely not. Now, with respect to the dispute, if there is one, or if there is one remaining, I guess we'll find out in a minute, over the breadth or insufficiency of your disclaimer, your position— correct me if this is a misstatement in any way— but your position is you have no— your position is it has not been brought by Elon or any successor, Nassim, etc. heirs on this patent. On either of the patents, right? Either of these patents. You're on. That's correct. Here against anybody. We have said— Customers, janitors, elementary school teachers, nobody. Against the world, and we have made that representation, and it's in our record. The other side seems to think that your representation is not broad enough, and that's what puzzles me. Your Honor, that's the first time on appeal that we've heard that argument. Mr. Pavan, is that good enough for you? How's that? Is that representation good enough for you? At this point, yes, it is, Your Honor. Okay, so— Except that it would be a valid comment. Not for the attorney fees, which remain pending below, and which they've agreed remain pending below, and which they agree that they are subject to. I think it's in page 8 footnote of their brief. They acknowledge that they're subject to those proceedings. So what procedurally would be the right way for us to go forward, since we're agreeable that Elon is not involved in the merits part of the case? You think they just— they stay in for the ride, or— I think they're only— when we go back below, the judge reserved on the question of attorney fees pending the outcome of this appellate review. And when it goes back down for attorney fees, they are both in that proceeding, yes. Very well, why don't you go ahead. Okay, so that's it for Elon. I think the only thing I would say there is I did go back and carefully look at their representations that they claim to have previously made, and they were all either we are willing to make or we have made, but I never found one where they actually made it, but now I agree it's clear, and thank you for that. Let me talk briefly about the merits of the appeal on the two patents that are at issue here. I believe the questions that your honors posed during my opposing counsel's argument strike right to the heart of the question here. The case law seems to be crystal clear, cruciferous spouts, the Benvenu Laboratories case, many of the other cases that this court has addressed on Abbott versus Baxter, and so on, mail bio file, all of those cases have stood for the proposition that inherent results are not patentable. If you are following the same method that was in the prior art, and that's what your claim is directed to, the same method, you cannot get a new patent on that method simply by discovering an inherent result of that method. That is clear. So now we have one set of claims, I believe it's in the 128 patent, the first patent, which basically is exactly that. There is no informing step. It says take metaxalon with food, and be aware that it's going to increase your bioavailability. Can I just direct? What would it be then if in fact the determination that the improvement of the bioavailability was not known? You took it with food, but you didn't know what the effect was. It makes absolutely... It's only a gastrointestinal correction. I think it makes absolutely no difference. I think there are several cases that say exactly that. It's not necessary for anyone to have appreciated the results for it to have rendered it unpatentable. I think cruciferous sprouts was one such case. No one appreciated the anti-carcinogenic effects of those sprouts, and nevertheless, it was held to be in anticipation. And the cases come out and say that in hoc verba, not just my interpretation. Turning to the 101 instruction claims that we were focusing on with your friend on the other side, can you respond, and this is more in the briefs than necessarily what he said, but it may come down to, on the instruction issue, a question of whether or not in re negai, the limitations of that decision are met. And that, and if you take gotcha or whatever the other case is, it seems that the criteria for distinguishing the results in those two cases is whether or not the instructions are something called functionally related to the claimed method. So the question here is what your view is of whether or not they are functionally related. Okay, I will answer that, and then I'd like to make one other argument about those claims as well. The answer is, I think they're clearly not functionally related. And I think the test for functional relationship is, is there something in those instructions that results in some alteration of the method or in the case of the negai, the product? Here, there's no alteration. The method is fully recited in the claim. The claim says, take metaxalon with food, and then inform patient of results. Well, you inform the results, you're not changing the method. So you're... Well, I don't want to cut you off. You're going to get to the second explanation. I don't want to be cut off. To see if I understand what you're saying about the changing of method. I mean, if the instruction said, take it with food, but eat the food slowly over a 20 minute period, that would be a change. Could be a change. Might still be in the prior art, but it would be a change. Yeah, but that's correct. But here, there's nothing there. It's just simply saying, do the method. It's there to tell you to do what the method already says, which is take metaxalon with food. There is no difference. In your view, is there a distinction to be drawn between the instruction claims and the printed label claims? I can't perceive it, except to the extent that my opposing counsel, I guess, said that one is somewhat broader than the other. But no, I don't see a distinction. You had a second point that you were going to raise, and I got in the way. No, that's OK. Thank you. Go ahead. Thank you. The informing step. To me, there's a certain absurdity to that step, which turns the law somewhat on its head. All it does is exalt the form of claiming over the substance of what we really have here. The cases often say in these cases, what is patented here? What are we patenting? Well, if we accept the proposition that the law is that you cannot patent inherent results, how can it possibly be that I am now precluded from telling somebody about those inherent results? If you can't get a patent on discovering that sprouts have an anti-carcinogenic effect, so you're not allowed to patent that per se, can I now really get a patent that says, but you can't tell anybody about that, because my patent says you can't inform anybody about that? That can't be the law. It makes no sense. Also, if somebody is taking here metaxalon with food, clearly, they're going to argue that's an infringement, whether you're taking it, as you pointed out, for treating a gastric ailment, or whether you're taking it to improve bioavailability. That's all the claim requires. Let's go back and look at the claim, taking metaxalon with food. That's the claim. Do you have any other questions? I'd be happy to answer them, but I think these claims are pretty clearly anticipated under the existing law. If I can return to Elon for just a minute, and this is sufficiently complicated that I want to make sure I understand exactly what your position is with respect to what we should do in response to Elon's request to be left out of either the case altogether, or at least any adjudication of the merits of this dispute. Tell us what you think the right order for us to write with respect to Elon's request would be. That is to say anything other than, I mean, I suppose one starting place would be denied, period, end of case. But do you have, is there a way that you think it is appropriate for us to accommodate Elon's position that they are no longer parties to the merits of the case setting aside the attorney portion of the case? Yes, I think in view of the covenant not to sue that I heard here today, I think under the law as I understand it. Can I back up one second and just talk briefly? When we moved for summary judgment, all we did was move for summary judgment of invalidity. Invalidity is kind of a against the world thing. It's a under blonder tongue. It's not just against King. Once the patents are invalid, they're invalid for everybody. I don't know that it's meaningful to talk about a judgment of invalidity of patents against a particular party. They're invalid for the world at that point. So it's somewhat of a moot point, meaning it doesn't really, as I see it, have any practical significance whether the judgment also names Elon as a party or not. The judgment below simply said that the patents are invalid. Then, and the judge, after quite a bit of letter writing back and forth, ultimately we had some counterclaims of unenforceability against Elon and King. He dismissed all of the other counterclaims. He dismissed all the pleadings from the case. And the only thing he reserved was the attorney fees. So for me, I think in view of the covenant and view of what I just stated about invalidity, as far as I'm concerned, King, excuse me, Elon does not have to take part in any aspect of the merits of the case from this point on. But I do think they are subject to the claim of attorney fees. And I think the case law is clear on that, that you can't, by a covenant not to sue, extract yourself from a valid claim for attorney fees. Now, whether there's a valid claim for attorney fees against Elon is currently pending before the district court. He may ultimately conclude there is not. But that's for him to decide when the case gets remanded. So that's how I see it. But on which action? The first action that was brought by Elon or the second one? It's an interesting question. Certainly on the first action that was brought by Elon, which he, by the way, rolled into the second action for purposes of the attorney fees. Insofar as the second, I think there's an interesting legal question there. Because Elon, again, is the party that took out these patents and that engaged in the inequitable conduct. Having been that party, it seems to us that there is a claim that they should also be held at least jointly and severally liable for any claim of attorney fees, having actively participated in what we believe was the withholding. Those counterclaims are gone from the action. That's correct. There is no counterclaim. But a claim for attorney fees, and this was briefed extensively, I think, before the main briefs here to this court, Elon made that exact same argument that because the counterclaim's gone, there should be no jurisdiction. Now, in my book, I'm sorry, go ahead, please. But don't you really are looking at a 285 type of? Yes. That's exactly right. So you're looking at an exceptional case. Correct. By the court. And also the inherent power, but yes. But you're looking at it from the perspective of this particular action, not the previous action. If the previous action is still rolled in, as you called it, is it still in existence? Or has it been dismissed? No, I don't think it is. I'm sorry. Because it's no longer viable, is it? I think specifically, I don't remember the exact wording of what the judge did. But I think he severed the claim from attorney fees in the 400 milligram, the first action, and joined it in this action. So I think it does survive to that extent. That was the nature of his order. Have I got that correct? Yes. So what is your answer to Judge Bryson's question about what the order should say? I mean, what should we do with respect to their status as a party? I think the case should just be remanded to the district court for further proceedings on the attorney fees claim. And the judgment on invalidity should be affirmed. And I don't know that it makes any difference with respect to Elon at that point. OK. Thank you. Thank you. Thank you, Your Honor. I guess both of the appellants have reserved a little time. So we'll hear from both of the appellants if they choose to be heard. Thank you, Judge Bryson. I'll be as brief as I can. Mr. Pavane continues to say that all these patents claim are take my tax loan with food. I think the claim language demonstrates otherwise. And that's really the fundamental flaw in the district court's approach in this case. Cruciferous sprouts, we've talked about. That case was just claiming a property. Here, you're not just taking sprouts. You're doing more scalaxin in this case. You're doing more and getting different results under different conditions. The greater bioavailability from the food effect actually transforms the course of the treatment of the patient. It changes what doctors do. It changes what the patients do. Secondly, with regard to Nagai, Judge Prost, you asked the question of my friend. You didn't say that about the sprouts. A doctor knowing that the sprouts were effective against various forms of cancer would give the sprouts to different class of people than the moms and pops who are feeding the five-year-olds who are resisting taking broccoli and cauliflower. Absolutely. And the only difference there is that the question in this case is whether the way that these patents are written and the fact that the discovery has been made into a specific limitation in a specific claim step makes them non-inherently anticipated. And we say, because there is disputed evidence on this record. We get to Nagai, Judge Prost. You asked the question of my friend whether the instructions are functionally related to the claim. These same reasons that I've just been talking about with Judge Bryson, yes, they are. They are essential to getting the doctors to make the right course of prescription, getting the patients to take the medicine for the right reasons. The conditions of the prior art do not tell you enough about the conditions to know if you get an increase in bioavailability. The use in Nagai was patentable. Just the entire kit was not patentable. And I'd point out that we originally claimed in this case, we applied for a claim on the entire kit. That's at A139, but we canceled that claim. I think unless the court has further questions, that should answer the judgment made by my friend on the other side. Thank you. Thank you. Mr. Monroe. Just a couple of quick points. It may be moot, but as far as the prior representations issue, our brief shows and record shows, we did say against anyone against the world. As far as the right type of order, I think it does matter. It's not a moot issue. One of the things Eon is arguing right now before the district court is that the holding of invalidity against Elan entitles Eon to attorney's fees from Elan. It's not just purely they're wrapping up the invalidity holding against Elan as part of their 285 attorney's fees claim. And so it does matter that that invalidity counterclaim could not have been asserted and could not have been pursued under the declaratory judgment. But only the action that was taken on the 400, which was rolled over. This is with respect to the 800, Your Honor. That they're trying to argue that they're entitled attorney's fees from Elan in the 800 case that Elan did not file. Were you formerly a cross-claim defendants in that case, or was this wrapped up before that distinction was created? And there was a counterclaim, I take it, in the case you brought. I just can't keep repeating it. The 400 milligram case. The smaller one came first. The other one, you weren't a party until you were brought in. And that's the case. And this is what's important. The 400 milligram case is the first case that we were a party, and that only attorney's fees claim has been wrapped in. The case on appeal here is the 800 milligram case that we did not file, that we got brought in as a counterclaim defendant. Well, it would be a cross-claim, right? It was not a cross-claim. King agreed we were not a proper party. King filed suit against Eon. And then Eon counterclaimed against Elan, arguing invalidity. The two were not in the case. Correct. Normally, a counterclaim is against somebody who's already in the case. Yeah. That's my point. Right. OK. Sorry, I just wanted to make the correct. We're on the same page. We're into simple procedure one. Correct. That's right. There's no, all right, I understand. And they brought it, correct. And they brought us into the 800 milligram case in that method. And the kind of order that we were looking for, for purposes of the district court, is that its invalidity holding, or judgment, to the extent it's affirmed, should be vacated as to Elan, so that the court won't, in turn, argue that it'd be misled into believing it can rely on this invalidity holding to support an attorney's fees claim against Elan, when Elan was not a proper party in the first place. OK. Thank you. Case is submitted.